NABAKOWSKI, DIR., APPELLEE, *v.* 5400 CORPORATION ET AL., APPELLANTS.

(No. 50580—Decided June 2, 1986.)

*Anthony J. Celebrezze, Jr.,* attorney general, and *Michael P. O'Grady,* for appellee.

*Corpas & Pahys* and *Thomas R. Pahys,* for appellants.

PRYATEL, P.J.   This case arises out of defendant Mark Harris' implementation of a scheme to defraud the Ohio Lottery Commission of nearly $200,000.

The Lottery Commission's director filed (1) a complaint, (2) a motion for a preliminary injunction, and (3) a temporary restraining order against defendant Mark Harris, defendants-appellants G. John Harris and Marlene Harris, defendant 5400 Corporation (d.b.a. Metropolitan Management), etc.[1] The complaint alleged, *inter alia,* that Marlene Harris (secretary-treasurer of 5400 Corporation) on behalf of herself, G. John Harris (president of 5400 Corporation) and the 5400 Corporation applied for and received a lottery sales agent license subsequent to the date that the corporation's charter had been canceled for failure to pay franchise taxes. The complaint further alleged that due to the cancelation of the charter, Marlene and G. John Harris were personally liable for all actions taken on behalf of the 5400 Corporation, which included Mark Harris' scheme to defraud the Lottery Commission through the illegal, unauthorized use of a Lottery Commission terminal.

The affidavit of Joseph Little, a field service engineer responsible for servicing and maintaining the Ohio Lottery Commission's ticket-issuing machines (hereinafter "TIM"), was attached to the complaint. Little stated that on September 7, 1984, he responded to a service call at Metropolitan Management (5400 Corporation) and observed large numbers of Ohio Lottery Daily Number Tickets spewing from the machine in an uninterrupted stream. Little was told by a 5400 Corporation employee (Mark Harris) that he had a "system" in operation so that he could play thousands of dollars worth of chances without paying for the bets in the hopes of winning large sums of money. The employee admitted that on the previous Monday he played $27,000 worth in tickets; $37,000 on the previous Tuesday; $97,000 on the previous Thursday; and an estimated $27,000 on the day of the service call. The employee planned (1) to win as many tickets as possible and repay the Lottery Commission for the tickets already issued, and (2) (if he did not win by September 11, 1984), to play every conceivable combination and then permit the commission to remove the machine from (what he believed was) an Ohio corporation with no assets.

---

[1] The other parties were dismissed.

On September 11, 1984, the trial court granted plaintiff's motion for a temporary restraining order. On September 27, 1984 following a hearing, the court granted plaintiff's preliminary injunction request.

Thereafter, counsel for defendants-appellants filed motions (1) to dismiss for failure to state a claim upon which relief could be granted or in the alternative to make the complaint "more" definite and certain; (2) to vacate or dissolve the preliminary injunction; and (3) in limine to exclude evidence relating to the cancelation of the articles of incorporation of 5400 Corporation; evidence relating to criminal convictions against G. John Harris; any evidence relating to prior business involvements and/or corporations of G. John Harris; and any evidence that defendant Mark Harris said that his father (G. John Harris) was aware of his (Mark's) scheme to defraud the Lottery Commission. The trial court overruled these motions.

Prior to trial, the court granted plaintiff's motion for default judgment against the 5400 Corporation (d.b.a. Metropolitan Management).

The following evidence was adduced at trial. On April 27, 1981, the 5400 Corporation was incorporated for the purpose of managing the buildings at 4900 Euclid Avenue. Defendants-appellants G. John Harris and Marlene Harris were the president and secretary-treasurer, respectively.

On April 12, 1982, Marlene Harris (on behalf of 5400 Corporation) signed an application for a lottery sales agent license stating, inter alia, that neither the applicant nor any principal (defined as all proprietors, general partners, officers, directors and shareholders with more than ten percent of the voting stock) was convicted of an offense other than a minor traffic violation. On May 1, 1982, the Lottery Commission granted the application. Over objection, it was revealed that G. John Harris, president of 5400 Corporation (and listed on the application as a principal) pled guilty to two federal counts involving forged securities. Marlene Harris explained that she thought the reference to convictions pertained only to her; hence she denied any convictions on the application.

On May 17, 1982, Marlene Harris filed an addendum to the original application to operate a daily game terminal. The addendum was granted and a ticket issuing machine ("TIM") (a computer terminal that issues tickets) was placed on the 5400 Corporation's premises at 4900 Euclid Avenue.

Irving Portman, employed by the Ohio Lottery Commission to train new on-line agents how to operate the TIM, testified that he conducted a one-day training session on July 6, 1982, and that Marlene Harris, G. John Harris, Diane Drake (a 5400 Corporation employee) and one other female employee attended the session. (G. John Harris denied attending the training session.)[2]

Eventually Mark Harris (G. John Harris' son) was hired to run the daily lottery operations, including the TIM. Apparently, due to "robberies," the TIM was moved from the main building lobby of 4900 Euclid Avenue into the vacant bank drive-through unit located in the rear lot. The unit was equipped with bulletproof glass and a security lock system.

On November 4, 1983, the 5400 Corporation's charter was canceled for nonpayment of franchise taxes. Nevertheless, as conceded by G. John Harris, its president, the corporation continued its daily business operations.

On September 3, 1984, Mark Harris initiated his scheme designed to win funds from the Lottery Commission without paying for the bets he placed. Mark admitted that from September 3, 1984 until September 7, 1984, he input selected numbers in numerous wagers,

_____

[2] Mark Harris was not yet employed by the corporation.

which totalled nearly $200,000. When Mark placed these bets, they became electronically inserted in the group eligible to win lottery proceeds.

Mark's scheme was discovered on September 7, 1984 when Joseph Little, the computer repairman, responded to a service call which arose from a blown fuse. Little observed four garbage bags full of lottery tickets and noticed that the knife of the TIM had been disconnected so that tickets were issued in a continuous stream rather than cut individually. According to Little, Mark explained his scheme to him and stated that when he told his father of his actions, G. John Harris suggested that Mark carry through with his plans. However, at trial, Mark denied telling his father of his plans and stressed that his father had no knowledge of his actions; consequently, his father did not encourage him to go forward with his scheme.

The Lottery Commission's director of security immediately investigated the instant matter. On that same day (September 7, 1984), at 2:07 p.m., the TIM was deactivated. On September 17, 1984, the machine and other lottery materials were confiscated by the State Highway Patrol. Mark was subsequently arrested and convicted for grand theft.

Both Marlene and G. John Harris denied having knowledge of Mark's scheme against the Lottery Commission. In fact, Marlene testified that she first learned of Mark's activities on September 7, 1984 when she was phoned by a lottery security director. G. John Harris stated that Mark initially lied to him about the scheme and that he read in the newspaper of his son's actual involvement the next week.

At the close of the trial, the court (1) directed a verdict in favor of the commission and against Mark Harris on count one; (2) dismissed the second count of plaintiff's complaint; and (3) overruled the commission's motion for a

directed verdict against G. John Harris and Marlene Harris. The jury found G. John Harris and Marlene Harris jointly and severally liable for $187,000.

G. John Harris and Marlene Harris filed the instant appeal. They assigned ten errors, but briefed these errors in three separate arguments. Consequently, we will treat the three segments as the assignments of error.

Assignments of Error Nos. I and II.

"I. Appellee may not attack the corporate status of the defendant, 5400 Corporation.

"II. Neither appellant, Gary John Harris nor Marlene Harris, are personally liable to appellee under the complaint as filed."

These assignments of error are interrelated and will be treated together.

Appellee, Ronald Nabakowski, Director of the Ohio Lottery Commission, alleged in his complaint that:

"Defendant 5400 Corporation was a duly organized corporation conducting business in Ohio under charter No. 573525 issued by the Ohio Secretary of State on April 27, 1981. On November 4, 1983 said Charter was cancelled by the Secretary of State of Ohio due to said corporation's failure to pay franchise taxes as required by O.R.C. 5733.20. Pursuant to O.R.C. 1701.88(A) all actions taken on behalf of or in the name of Defendant, 5400 Corporation, subsequent to November 4, 1983 are personal in nature and are not subject to the protections afforded by Ohio's General Corporation Act."

Appellants contend that (1) appellee's complaint was an improper collateral attack on the status of the 5400 Corporation (*Society Perun* v. *Cleveland* [1885], 43 Ohio St. 481; *Bartholomew* v. *Bentley* [1852], 1 Ohio St. 37); (2) appellee should have been precluded from raising the issue of the existence of the 5400 Corporation on the basis of waiver and/or estoppel (*Hagerman* v. *Ohio Bldg. & Sav. Assn.* [1874], 25 Ohio St.

186; *Lucas* v. *Greenville Bldg. & Sav. Assn.* [1872], 22 Ohio St. 339); (3) the court erred in holding appellants personally liable where neither appellant participated in the theft; and (4) appellee's complaint failed to state a cause of action upon which relief could be granted.

We find the Montgomery County Court of Appeals decision of *Chatman* v. *Day* (1982), 7 Ohio App. 3d 281, to be persuasive on the first three issues raised in this assigned error. In *Chatman,* the plaintiffs entered into a construction contract for the erection of a garage with Peach Tree South, Inc., a family corporation owned by Earl Day and his wife. The contract was on the printed form of Peach Tree South, Inc. stationery and was signed by plaintiffs as owners and by Earl Day both as "company representative" and as the "contractor" accepting the contract. When the written contract was entered into, Peach Tree South, Inc.'s charter had been canceled for non-payment of franchise taxes. The plaintiffs made two payments by check to Peach Tree South, Inc. One of the checks was indorsed in the corporate name by "Earl Day, Pres."

When a cement slab for the garage was laid down improperly, necessitating plaintiffs to complete construction of the garage at their own expense, plaintiffs brought suit against the corporation and against Earl Day individually. Judgment was entered against the corporation (which the trial court labelled as a de facto entity) but the claim against Earl Day was dismissed. Plaintiffs appealed, alleging that the court erred in not holding Earl Day liable individually.

On appeal, the court framed the issue as follows: Is a principal officer of a corporation who continues to conduct business and to create obligations after a corporate charter has been canceled personally liable for those obligations? The court relied on R.C. 1701.88(A) to reach its conclusion. This statute reads as follows:

"When a corporation is dissolved voluntarily, *when the articles of a corporation have been canceled,* or when the period of existence of the corporation specified in its articles has expired, *the corporation shall cease to carry on business and shall do only such acts as are required to wind up its affairs, but for such purpose it shall continue as a corporation."* (Emphasis added.)

The court interpreted R.C. 1701.88 (A) at 282:

"Under this section of the Corporation Act, the authority granted to a corporation by law is removed by the legislature for all purposes except such as are necessary to wind up its affairs. * * * The firm proscription in the Corporation Act, accompanied by authority for only a limited purpose, indicates an intention of the legislature to withdraw the power of such corporation and not to tolerate the use of lapsed corporations by individuals as a shield for continuing business under the name of a dead, defunct and possibly insolvent corporation.

"Our conclusion is that under R.C. 1701.88(A) of the general Corporation Act, when the articles of a corporation are canceled, whether by the Secretary of State or otherwise, the authority of the corporation to do business ceases and *after such termination officers who carry on new business do so as individuals, lose the protection of the Corporation Act, and are personally responsible for such obligations as they incur."* (Emphasis added.)

The *Chatman* court distinguished earlier cases which protected individuals who did business after their charters had been canceled (such as *Eversman* v. *Ray Shipman Co.* [1926], 115 Ohio St. 269 and *I. J. Goldstein Co.* v. *Mitchell* [1921], 14 Ohio App. 231—relied on by appellants here). According to *Chatman,* these decisions interpreted only the tax

statutes in R.C. Chapter 5733 relating to the enforcement of tax payments and the filing of annual reports and were made prior to the enactment of R.C. 1701.88(A). Indeed, the *Chatman* court specifically held that the provisions in the Corporation Act (R.C. 1701.88[A]) eliminate the rationale of the earlier decisions. *Id.* at 283.

*Chatman* also denounced the reliance on collateral attack and estoppel arguments to protect the individuals from liability—precisely what appellants would have this court do. The *Chatman* court stressed that:

"[R]ationalizations based upon public policy, *de facto* activities, immunity from *collateral attack* and the like are founded upon the existence of a corporate entity by force of legislative enactment. When the enactment creating the corporation also provides for its termination and denies it the right to do business other than to liquidate, there is no necessity in a case such as we have here to rely upon other than statutory enactments unless the facts necessitate such rationalization. *Estoppel* may be justified against one who obtained corporate assets after forfeiture, but no rationalization will justify an officer or excuse his personal responsibility when he has been stripped of the authority by the sovereign that gave him such power. Such is the effect of R.C. 1701.88(A). To conclude otherwise is to encourage fraud upon the public by those who know or should know that the legislature canceled their authority to act as agent for the corporation." *Id.* at 283-284.

We are not persuaded by appellants' contention that *Chatman* is an improper statement of the law which "has, in effect, completely swept away that entire body of law dealing with de facto corporations." Nor do we accept appellants' stance that the present-day statutes (R.C. 1701.88[A] and 1701.97) are the same as the provisions in the General Code relied on by the *Eversman*

court. The *Eversman* court considered only taxing statutes and did not have before it R.C. 1701.88(A) (enacted after *Eversman*).

Alternatively, appellants argue that if *Chatman* is correct, they could not be held liable individually because they were not actual participants in Mark Harris' theft. Appellants rely on *Columbia Real Estate Title Ins. Co.* v. *Columbia Title Agency, Inc.* (1983), 11 Ohio App. 3d 284, 286, which states that:

"* * * the actual holding of the court in *Chatman* was that actual participants in a transaction after forfeiture of a corporation charter are individually responsible."

Although the individual defendant in *Chatman* was an actual participant in the transaction complained of, in our opinion the holding of *Chatman* is *not* limited to actual participants but includes passive principals in the company. In the instant case, the appellants, in their capacity as officers of a corporation whose charter had been canceled, hired Mark to be in charge of and operate the lottery terminal. They also renewed their contract with the Lottery Commission knowing that their corporation was not in good standing. Therefore, they became liable to any obligations arising pursuant to their contract with the Lottery Commission. Appellants cannot claim the potential benefits that may flow to the corporation via an employee's representation in the lottery pool while disowning the consequences of the corporation's illegal operations. This includes an employee's scheme to defraud the Lottery Commission.

In applying R.C. 1701.88(A), we find that the appellants as principals, with either passive or active knowledge of the scheme to defraud, became liable personally for their employee's actions when they elected to continue doing business with the Lottery Commission after their charter had been canceled.

We conclude that the trial court did not err in overruling appellants' motions to dismiss and motions for directed verdict. Nor did the court err in (1) permitting appellee to refer to and introduce evidence relating to the cancelation of the articles of incorporation; (2) refusing to instruct the jury on issues of waiver and/or estoppel; and (3) instructing the jury that appellants were liable personally if they operated the business after the charter was canceled.

As to appellants' contention that the complaint failed to state a cause of action upon which relief could be granted, we are mindful that Ohio has progressed from "fact pleading" to "notice pleading"[3] (*Salamon* v. *Taft Broadcasting Co.* [1984], 16 Ohio App. 3d 336, 338) and that "[i]n order for a court to dismiss a complaint for failure to state a claim upon which relief can be granted (Civ. R. 12(B)(6)), it must appear beyond doubt from the complaint that the plaintiff can prove no set of facts entitling him to recovery. (*Conley* v. *Gibson*, 355 U.S. 41, followed.)" *O'Brien* v. *University Community Tenants Union* (1975), 42 Ohio St. 2d 242 [71 O.O.2d 223], syllabus.

In Count One of the complaint, appellee alleged, *inter alia,* that (1) the articles of incorporation of the 5400 Corporation were canceled on November 4, 1983 and that all actions taken after that date in the name of the corporation were personal in nature; (2) Marlene Harris, on behalf of herself, G. John Harris and the corporation, applied for and received a lottery sales agent license; (3) on September 7, 1984, defendants' agent (acting with or without the direct knowledge of defendants) embarked upon an illegal scheme designed to and did defraud the Ohio Lottery Commission of funds due in excess of $187,000 through the illegal, unauthorized use of a computer terminal; and (4) Marlene and G. John Harris failed to provide adequate security and safeguards for the operation, equipment and materials of the Ohio Lottery Commission, which caused the Lottery Commission to lose $187,000.

Appellants' argument that the complaint was vague and did not contain any "factual" allegations is without merit, particularly when accompanied by the affidavit of Joseph Little (the computer repairman with direct knowledge of the scheme to defraud) which outlined in detail the underlying fraudulent activity. In light of Civ. R. 8(A) and the *Chatman* decision, we conclude that appellee alleged sufficient operative facts to state a cause of action.

We overrule appellants' first and second assignments of error.

Assignment of Error No. III

"III. The trial court committed prejudicial error and abused its discretion in its pre-trial decisions, its conduct of the trial: its actions, rulings and comments reflect a bias or prejudice against appellants, all requiring reversal or a new trial."

Appellants maintain that:

"(1) The trial court's injunctive orders went beyond its authority and illustrated its bias against appellants;

"(2) The trial court's ruling allowing appellee to introduce the criminal conviction of appellant, Gary John Harris, was erroneous, prejudicial and indicative of the trial court's bias;

"(3) The past business activities and corporate affiliations of appellants were not proper subject matters for examination by appellee; and

---

[3] Civ. R. 8(A) states, in pertinent part:

"A pleading which sets forth a claim for relief, whether an original claim, counterclaim, cross-claim, or third-party claim, shall contain (1) a short and plain statement of the claim showing that the pleader is entitled to relief, and (2) a demand for judgment for the relief to which he deems himself entitled. * * *"

"(4) The trial court's questions and comments throughout the trial revealed a bias or prejudice against appellants."

Each of these contentions will be addressed separately.

On September 11, 1984, the court granted appellee's motion for a temporary restraining order and ordered appellants to refrain from "disbursing, spending, encumbering, transferring, selling, mortgaging, pledging or otherwise alienating any and all property real, personal, and intangible belongings to said Defendants, with the exception of those expenditures necessary for their personal sustenance, pending further Orders of this Court."

A hearing on appellee's motion for a preliminary injunction was held on September 21, 1984. The court found that the Lottery Commission had an inadequate remedy at law and was in danger of suffering additional irreparable harm. The court further found that appellants had concealed their whereabouts from investigators making it "a virtual impossibility for plaintiff [appellee] to ascertain such basic information as the residence address of defendants or their places of employment." The court explained:

"Based upon what appears to this court to be a pattern of concealment of identity of the principals of corporation which defendants utilize in their business transactions, it is the opinion of this court that, unless restrained by further order of this court, defendants have the very real ability to further conceal themselves and their assets with the sole objective of frustrating the legitimate attempts by plaintiff to discover that evidence which will ultimately lead to the resolution of this lawsuit.

"Now, therefore, based upon the evidence presented, it is the order of this court that plaintiff is granted a preliminary injunction whereby defendants, G. John Harris, Marlene Harris * * * are restrained in both their personal and corporate capacity from disbursing, spending, encumbering, transferring, selling, mortgaging, pledging or otherwise alienating any and all property, real, personal, and intangible, belonging to said defendants, pending further orders of this court."

The court also ordered appellants to refrain from engaging in any activity detrimental to the Lottery Commission. The preliminary injunction was ordered dissolved in the court's June 14, 1985 judgment entry reflecting its jury verdict finding appellants liable.

Appellants contend that the court's injunctive orders illustrate bias and amount to an improper attachment of assets before judgment. Since appellants failed to provide us with a transcript of the preliminary injunction proceedings, which is necessary to exemplify the errors alleged, we must presume regularity of the trial court's proceedings. *Beach* v. *Sweeney* (1958), 167 Ohio St. 477, 478 [5 O.O.2d 157].

Appellants next assert that it was error to introduce the criminal conviction of G. John Harris since it was inadmissible under Evid. R. 404(B) and 609(B). Appellants filed a motion *in limine* to prohibit the introduction of this testimony. Nevertheless, the court overruled this motion. At trial it was revealed that in March 1971, appellant G. John Harris entered a guilty plea in federal court and was convicted for two counts of forging securities. Appellant testified that he was imprisoned and placed on probation until 1974.

Evid. R. 609(B) states:

"Evidence of a conviction under this rule is not admissible if a period of more than ten years has elapsed since the date of the conviction or of the release of the witness from the confinement, *or the termination of probation,* or shock probation, or parole, or shock parole imposed for that conviction, whichever is the later date, unless the court determines, in the interests of justice, that the pro-

bative value of the conviction supported by specific facts and circumstances substantially outweighs its prejudicial effect. However, evidence of a conviction more than ten years old as calculated herein, is not admissible unless the proponent gives to the adverse party sufficient advance written notice of intent to use such evidence to provide the adverse party with a fair opportunity to contest the use of such evidence." (Emphasis added.)

When defense counsel objected to the introduction of the criminal convictions, the trial court ruled that the convictions occurred ten years from the date of probation and that they were admissible since it was a matter of "crimen falsi" (pertaining to perjury crimes which bear on defendant's ability to testify truthfully).

Appellant's probation terminated in 1974. The instant trial commenced in June 1985. The trial court incorrectly ruled that the evidence of the prior conviction fell within the ten-year limitation in Evid. R. 609(B). Nevertheless, Evid. R. 609(B) allows the court to introduce such testimony if the probative value outweighs its prejudicial effect. In our opinion, the introduction of this testimony was more probative than prejudicial.

To begin with, a motion *in limine* need not be granted until the facts of the case are developed to determine the then-admissibility of the evidence. In this case, the application for the lottery sales agent license indicated that no principal of the 5400 Corporation was convicted of an offense (other than a minor traffic violation). The criminal convictions of G. John Harris were necessary to refute this false statement made by Marlene Harris to secure the lottery sales agent license. Hence, the introduction of this testimony was probative and admissible.

Appellants next claim that the court erred in allowing testimony about ap-

pellants' past association with various corporations for the purpose of showing appellants used "dummy corporations" to deceive the public. Appellants particularly object to the fact that on cross-examination there was extensive testimony as to the various businesses owned or operated by appellants and that it was revealed that an employee of appellants had a criminal record. The court, while admitting that the evidence was becoming confusing, allowed such testimony on the ground that it was "relevant to show the character and background of the defendants."

Appellee argues that the introduction of the employee's conviction was admissible to show that the appellants knew their employees could be involved in illegal activities and should have provided security against insider crimes. In order to offer this evidence, appellee states that testimony of other corporate activity had to be admitted for foundation purposes.

We disagree. The fact that one employee may be involved in illegal activities (in this case—receiving stolen coffee) is not indicative of other employees' conduct. Nevertheless, we find the introduction of such testimony harmless error in light of the evidence linking appellants contractually to the fraudulent activities committed against the Lottery Commission, notwithstanding that the corporation was in default.

As to the testimony concerning appellants' prior business associations, while we agree that the testimony was more lengthy than necessary, we do not find its introduction to be prejudicial error.

Finally, appellants posit that the trial court's comments and questions from the bench reflect a biased opinion of the case in favor of appellee. Appellants cite several instances of alleged bias. For example, (1) the court instructed appellants' counsel on how to object, when to sit or stand, how to

cross-examine, how to impeach; (2) the court assisted appellee, referred to appellee's counsel as a "sharp lawyer" and allowed appellee to ask improper leading questions of a witness; (3) the court called G. John Harris "street wise" and interrupted, questioned, and chided Marlene Harris; and (4) the court submitted three interrogatories to the jury.

Evid. R. 611(A)[4] recognizes the trial court's authority to exercise control over the courtroom. The trial court exercised such authority when it informed appellants' counsel how to conduct himself in his courtroom and when it became involved in the questioning of witnesses. While we recognize that the trial court interjected itself more often than necessary (and should have talked to counsel privately in a side-bar conference), the trial court interrupted appellee's counsel (no less than that of appellants' counsel) during questioning, reprimanded appellee's counsel by telling him to restrain his emotions, and threatened to charge appellee's counsel with contempt. These acts do not demonstrate bias but are likely to occur when counsel has limited trial experience, or tempers flare.

Nor do we find that allowing the jury to answer three interrogatories reflected bias. The interrogatories asked whether Mark Harris perpetrated fraud upon the Ohio Lottery Commission and whether Marlene and G. John Harris benefitted from the sale of lottery tickets after November 4, 1983 (after the corporation's charter was canceled). Upon review of the record in its entirety, we conclude that the charge of alleged bias fails.

Accordingly, appellants' third assigned error is overruled.

The judgment is affirmed.

*Judgment affirmed.*

ANN McMANAMON and KRUPANSKY, JJ., concur.

---

[4] Evid. R. 611(A) reads:

"The court shall exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to (1) make the interrogation and presentation effective for the ascertainment of the truth, (2) avoid needless consumption of time, and (3) protect witnesses from harassment or undue embarrassment."